KAB

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sammy T. Williams,<br><br>    Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>    Defendants. | No. CV 17-03625-PHX-DGC (MHB)<br><br>**ORDER** |

Plaintiff Sammy T. Williams, who is currently confined in Arizona State Prison Complex (ASPC)-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.) The Parties cross-move for summary judgment.[1] (Docs. 32, 36.)

**I.    Background**

In his Complaint, Plaintiff relevantly alleged as follows. Plaintiff is a chronic care inmate with multiple sclerosis (MS), is in a wheelchair, wears a metal leg brace for stability, and is in constant pain.

In Count One, Plaintiff alleges that he took Gabapentin, but when his prescription expired, Defendants Elijah and Ndemanu refused to renew it and requested that he pick an alternative antidepressant, but none of those medications would have been equal to Gabapentin in controlling Plaintiff's neuropathy.

. . . .

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 38.)

In Count Two, Plaintiff alleges that he had a serious fall in which he injured his hip and exacerbated his prior spine injuries, but Defendants Elijah and Ndemanu refused to discuss Plaintiff's pain or treatment with him, and have refused to give him the results of x-rays of his cervical and lumbar areas.

In Count Three, Plaintiff alleges that after his fall, he requested an MRI, but Corizon will only provide an x-ray from a machine that does not work properly, that Elijah and Ndemanu refused to order an MRI for Plaintiff's hip, that Defendant Ende took Plaintiff off the doctor's line and refused to discuss medical issues or pain-related issues with Plaintiff, and that Defendant Corizon refuses to authorize follow-up care ordered by a doctor outside the prison regarding Plaintiff's MS protocol.

In Count Four, Plaintiff alleges that he needs a back brace to stabilize his spinal column, but Defendant Ende refused to discuss the issue with Plaintiff, and Corizon refuses to provide proper care because it wants to increase its profit margin.

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims based on constitutionally deficient medical care against Corizon in Counts One through Four, against Defendants Elijah and Ndemanu in Counts One through Three, and against Defendant Ende in Counts Two through Four. (Doc. 8 at 7.) The Court dismissed the remaining claims and Defendants. (*Id.* at 7-9.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts

to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law), and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968), but must "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255.

**III. Facts**

Plaintiff is an inmate in the custody of the Arizona Department of Corrections. Defendant Corizon provides healthcare to the inmates. Defendant Ndemanu, Elijah, and Ende were employees of Defendant Corizon at all times relevant to the allegations in this action.

Plaintiff was diagnosed with multiple sclerosis (MS) in 2005. (Doc. 37 ¶ 1; Doc. 56 at 5 ¶ 1.) While there is no cure for MS, it is manageable through physical therapy and appropriate medications that slow disease progression. (Doc. 37 ¶ 2; Doc. 56 at 5 ¶ 2.) Prior to their first encounter, Dr. Itoro Elijah reviewed a Health Needs Request in which Plaintiff requested renewal of various special needs orders (SNO). (Doc. 37 ¶ 3.) On August 9, 2016, Elijah authorized SNOs for Plaintiff, including an ankle/foot orthotic, cane, orthotic shoes, sunglasses, a shower chair, a left knee brace, wheelchair gloves, an extra pillow, an extra blanket, a wheelchair cushion, a lower bunk assignment, no stairs, an ADA shower, an ADA porter, and meals in his living quarters. (Doc. 37 ¶ 4; Doc. 56 at 6 ¶ 4.) Elijah also reviewed Plaintiff's recent neurology records in which the specialist

recommended a repeat c-spine MRI, as well as Tecfidera, Gabapentin, Vitamin B12, and methylprednisolone (a corticosteroid) for disease management. At the time, Plaintiff had active prescriptions for Tecfidera and Gabapentin. (Doc. 37 ¶ 5; Doc. 56 at 6 ¶ 5.)

On August 17, 2016, Plaintiff and Elijah discussed Plaintiff's MS history. Plaintiff reported chronic weakness in the right side, upper extremities and lower extremities, and received his first dose of methylprednisolone the same day. Elijah entered a prescription for daily Vitamin B12 injections and prescribed Fioricet for migraine management. (Doc. 37 ¶ 6; Doc. 56 at 6 ¶ 6.)

On September 13, 2016, Plaintiff received an MRI of his spine and brain. (Doc. 37 ¶ 7; Doc. 56 at 6 ¶ 7.) On November 1, 2016, Plaintiff met with Elijah to discuss the results. Elijah told Plaintiff that the previously seen plaques on his brain were unchanged from his prior MRI and that the scan showed mild to moderate degenerative disc disease from C7-T1 and spurs at C6-7. (Doc. 37 ¶ 8; Doc. 56 at 6 ¶ 8.) On December 14, 2016, Elijah entered an offsite consult request for Plaintiff to follow-up with the neurologist. (Doc. 37 ¶ 9.) A week later, Elijah met with Plaintiff to go over the results of his recent thoracic, lumbar, and knee x-rays. The examinations were "normal," save for "mild dextroscoliosis" in the thoracic spine. (Doc. 37 ¶ 10.) Plaintiff reported neck and low back pains, especially with exercise. (*Id.*) Elijah's examination did not reveal any appreciable changes to Plaintiff's musculoskeletal system. (*Id.*)

Elijah opines that in his experience, the best approach to successfully and safely treat back pain is to teach the patient exercises and stretches he can perform to target the source of pain because stretching and strengthening exercise have no side effects, and target exercises are often the most effective method to treat the cause of back pain rather than masking symptoms. (*Id.* ¶ 11.) Elijah and Plaintiff discussed exercise to strengthen Plaintiff's abdominals to reduce stress on his neck and back. She also instructed Plaintiff to continue his current medications for pain control, which were Baclofen and Gabapentin. (*Id.*) On January 24, 2017, Elijah reviewed the results of Plaintiff's neurology consult from the previous day. The specialist recommended continuing Tecfidera and Baclofen, an

ankle/foot orthotic, and starting physical therapy. (*Id.* ¶ 12; Doc. 56 at 7 ¶ 12.) Elijah entered a physical therapy consult request the same day. (Doc. 37 ¶ 13; Doc. 56 at 7 ¶ 13.)

On February 8, 2017, Elijah informed Plaintiff that his recent MRI revealed "stability of lesions," and that his neurology follow-up was pending. (Doc. 37 ¶ 14; Doc. 56 at 7 ¶ 14.) Elijah noted that Plaintiff had a pending appointment to obtain a foot orthotic, had already begun physical therapy to address back pain, was on Gabapentin, Baclofen, Vitamin B12, and Tecfidera to manage his MS, that his MS-related seizures were well-managed with Keppra, and that his last seizure had occurred 2-3 years ago. (*Id.*) Elijah entered a SNO for a wheelchair cushion and placed new orders for B12 injections. (*Id.*) Plaintiff began physical therapy at USA Sports Physical Therapy the same day. (Doc. 37 ¶ 15; Doc. 56 at 7 ¶ 15.)

On February 16, 2017, Plaintiff received two pairs of orthotic shoes, one pair for "braces" and another pair "without braces." (Doc. 37 ¶ 16; Doc. 56 at 7 ¶ 16.) On February 20, 2017, Elijah ordered a Gabapentin serum blood test to ascertain the levels of Gabapentin in Plaintiff's system. (Doc. 37 ¶ 17; Doc. 56 at 7 ¶ 17.) Gabapentin can be effective in managing severe or chronic back pain due to spinal injury or dysfunction, but is highly regulated in the correctional setting due to the potential for abuse, misuse, and diversion. (Doc. 37 ¶ 18.) At the time, Corizon was carefully monitoring inmate Gabapentin prescriptions due to widespread abuse of the drug, so inmates were given periodic and random lab tests to ascertain their blood levels of the drug. Levels at or above 2.0 were deemed therapeutic, while levels below 2.0 were deemed non-therapeutic. (*Id.* ¶ 19.) Plaintiff's blood level was flagged as below normal level. He was on Gabapentin 1200 mg daily for over a year at that time, so his levels should have been within normal range. (Doc. 37 ¶ 20.)

On March 9, 2017, Plaintiff returned to USA Sports Physical Therapy where he reported that his back pain was resolving. The therapist recommended continuing a home exercise program. (Doc. 37 ¶ 24; Doc. 56 at 8 ¶ 24.)

Due to the low blood level test for Gabapentin, Elijah discontinued the prescription on March 30, 2017. (*Id*.¶ 21.) At the time, Plaintiff still had active prescriptions for Fioricet, Baclofen, and Ibuprofen for pain and muscle spasms, as well as Lamotrigine and Topimirate for epileptic seizures. (Doc. 37 ¶ 22; Doc. 56 at 8 ¶ 22.)

Sometime between March 20, 2017 and May 21, 2017, Plaintiff was transferred from the Barchey Unit to the Bachman Unit. (Doc. 37 ¶ 26; Doc. 56 at 8 ¶ 26.) On May 21, 2017, Plaintiff presented to the Nurse's line requesting a back brace and Ibuprofen. Elijah denied the request for a back brace because Plaintiff was already provided a back brace, but another doctor approved the Ibuprofen prescription. (Doc. 37 ¶ 25.) Plaintiff asserts that he had lost his back brace and still needed another. (Doc. 56 at 8 ¶ 25.)[2]

On June 29, 2017, Plaintiff saw NP Ndemanu for routine chronic care to address Hepatitis C and MS-related seizures. Plaintiff was continued on Tecifidera and Baclofen per the specialist's recommendation. (Doc. 37 ¶ 27.) On August 2, 2017, Plaintiff presented to NP Ndemanu complaining of spasms in his neck, back, and right leg, requested reinstatement of Gabapentin, renewal of SNOs, including a shower chair, a lower bunk, an ADA shower/porter and indoor work only. (*Id.* ¶ 28.) NP Ndemanu renewed all of Plaintiff's SNOs and ordered Baclofen, which treats muscle spasms in patients with MS and spinal cord injury/disease. Ndemanu did not order any additional medications. (*Id.*) Ndemanu was aware that Plaintiff's Gabapentin prescription was discontinued due to sub-therapeutic lab results, and she offered tricyclic antidepressants, including Elavil and Pamelor, which she believed were highly effective at treating neuropathic pain and were non-addictive. (*Id.* ¶¶ 29-30.) Plaintiff rejected trials of Elavil and Pamelor. (*Id.* ¶ 30.)

On September 5, 2017, Plaintiff saw NP Ende and reported right hand weakness and worsening back pain. (Doc. 37 ¶ 31.) NP Ende examined Plaintiff and noted greater strength in his right hand than in his left. Ende entered a new prescription for Gabapentin,

---

[2] The Health Services Encounter note does not state that Plaintiff lost his back brace. It does state that Plaintiff lost medications during his transfer. (Doc. 37-1 at 144.) It is not clear whether Elijah knew that Plaintiff claimed he lost his back brace.

but the prescription was assigned an alternative treatment plan, with a recommend trial of tricyclic antidepressants for neuropathy pain. (*Id.*) On September 8, 2017, Ende reviewed Plaintiff's most recent MRI report and neurology records, which suggested Plaintiff's MS was stable. Ende noted that Plaintiff had reported right-sided weakness during his January 23, 2017 neurology visit. (*Id.* ¶ 32.)

On November 2, 2017, Ende successfully reinstated Plaintiff's Gabapentin prescription, and it has since been active. (Doc. 37 ¶ 33; Doc. 56 at 9 ¶ 33.) That same day, NP Ende observed that Plaintiff was not wearing his prescribed leg braces.[3] NP Ende renewed several SNOs, including catheter supplies, a shower chair, a wheelchair, quad canes, wheelchair gloves, an elbow support, a lower bunk, a metal knee brace, a full leg brace with plastic/Velcro, UV glasses, and an extra blanket and pillow. (Doc. 37 ¶ 34; Doc. 56 at 10 ¶ 34.) On November 30, 2017, Ende ordered a back brace and TENS unit per Plaintiff's request to address his chronic low back pain and spasms. Plaintiff reported that he lost his back brace during his move from Barchey to Bachman. (Doc. 37 ¶ 35; Doc. 56 at 10 ¶ 35.) On December 7, 2017, Plaintiff received a back-support belt. (Doc. 37 ¶ 36; Doc. 56 at 10 ¶ 36.) On December 15, 2017, Plaintiff received a TENS unit. (Doc. 37 ¶ 37; Doc. 56 at 10 ¶ 37.)

On March 23, 2018, Plaintiff presented to NP Bass for his scheduled chronic care appointment, where he denied worsening symptoms regarding his MS diagnosis. (Doc. 37 ¶ 38.) Plaintiff disagrees with this asserted fact because he "complained of problems." (Doc. 56 at 10 ¶ 38.) NP Ndemanu and Ende do not recall Plaintiff ever complaining of a hip injury or pain or requesting treatment for either. Plaintiff asserts that he constantly complained of hip issues. (Doc. 37 ¶ 39; Doc. 56 at 10 ¶ 39.) Defendants assert that Plaintiff never submitted an HNR regarding his hip between August 2016 and January

---

[3] Plaintiff notes that he only wears leg braces when he walks, not when he is in a wheelchair. (Doc. 56 at 10 ¶ 34.)

2018. Plaintiff asserts that "he has turned in HNRs on the hip injuries," but does not cite to any evidence to support this statement. (Doc. 37 ¶ 40; Doc. 56 at 10 ¶ 40.)[4]

## IV. Discussion

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) the defendant's response was deliberately indifferent. *Jett*, 439 F.3d at 1096 (quotations omitted).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A prison official must both know of and disregard an excessive risk to inmate health – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need, as well as harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle*, 429 U.S. at 104-05; *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d

---

[4] Plaintiff does cite a February 20, 2013 Medical Grievance Appeal Response which purports to respond to a December 31, 2012 Grievance Appeal, which references that Plaintiff fell in the shower on January 23, 2013. But it is unclear how this response is relevant to Plaintiff's claims against Defendants. (Doc. 48 at 32.)

458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Additionally, to prevail on a claim against Corizon, as a private entity serving a traditional public function, Plaintiff must meet the test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978). *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Corizon had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (internal quotation and citation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents. It must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### A. Hip Injury

Defendants assert that Plaintiff alleges that he had inadequate medical treatment from an alleged fall that occurred "a couple months back" and that left him with

exacerbated hip and spinal issues, but the medical records are devoid of a single mention of hip injury or pain and no Defendant has a recollection of Plaintiff complaining of a hip injury or pain. (Doc. 36 at 10.) Defendants argue that there is likewise no evidence of any exacerbation of Plaintiff's spinal issues. As a result, Defendants assert that Plaintiff has not shown any serious medical need with respect to a hip injury, and summary judgment should be granted as to Plaintiff's claims regarding his hip.

In response, Plaintiff asserts that there are "numerous Health Needs Requests" on this subject, "most of [which] were ignored," and that Elijah and Ndemanu would not do anything regarding an MRI of the hip. (Doc. 48 at 8.) Plaintiff does not attach any of the alleged Health Needs Requests and does not cite any evidence that he complained to Elijah and Ndemanu of hip pain. Plaintiff does not include any details about instances where he complained to Elijah and Ndemanu about hip pain, what the date was, or what was said in response to those complaints. Plaintiff's conclusory assertions that he complained and was denied an MRI are not evidence demonstrating that he had a serious medical need. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Because there is no evidence in the record that Plaintiff had a serious medical need from a hip injury, summary judgment will be granted in favor of Defendants as to those claims.

**B. Medications**

Defendants assert that there is no evidence that Plaintiff's pain was treated with deliberate indifference because Defendants appropriately responded to and treated Plaintiff's low back and neuropathy pain. Defendants assert that Plaintiff would have remained on Gabapentin if it were not for his low blood level, and that Elijah's decision to discontinue Gabapentin was due to Corizon's policy and not because of deliberate indifference. Plaintiff asserts that his blood level was not below normal range, and that his blood draw of 1.9 was within normal range, but Plaintiff does not present any evidence supporting these assertions. Nor does he present evidence that he is qualified to testify to

what the normal range should have been. Plaintiff likewise asserts that the attempts to prescribe tricyclic antidepressants to treat his pain were inappropriate, but again presents no evidence supporting this assertion.

When Gabapentin was discontinued, Plaintiff remained on Ibuprofen, Baclofen, and Fioricet for pain. Plaintiff asserts that these medications were not equivalent to Gabapentin, but he does not point to any evidence showing that the discontinuation of Gabapentin for seven months and the offer of alternative tricyclic antidepressants was the result of deliberate indifference to his serious medical needs. Although Plaintiff argues that Gabapentin was the only available medication to treat his pain, he does not present evidence demonstrating that this is true. Nor does he present evidence that regulating Gabapentin in the correctional setting was unwarranted and the result of deliberate indifference to his serious medical needs. Accordingly, summary judgment will be granted in favor of Defendants regarding Plaintiff's claims that he was not prescribed appropriate medications to treat his pain.

**C.     Back Brace**

Defendants argue that Plaintiff has not shown deliberate indifference to his serious medical needs based on the time he went without a back brace. Plaintiff was prescribed a back brace on November 30, 2017. On May 21, 2017, Elijah denied Plaintiff's request for a back brace, noting that he already had one. Plaintiff was later provided a back brace in December 2017. There is no evidence in this record that Elijah's one-time denial of a second back brace was the result of deliberate indifference to serious medical needs. Specifically, there is no evidence that Elijah knew that Plaintiff claimed to have lost his first back brace. Plaintiff has failed to show that the denial of a back brace was the result of deliberate indifference to serious medical needs, and summary judgment will be granted in favor of Defendants as to this claim.

**D.     Corizon**

Defendants argue that there is no evidence that Corizon promulgated a custom or policy that deprived Plaintiff of his civil rights, and the record shows that Plaintiff received

timely and continuing care for his serious medical needs. In response, Plaintiff asserts that constant and severe pain "is proof enough" and that "delays and denials" show deliberate indifference. Plaintiff does not point to any evidence demonstrating a pattern or practice of failing to respond promptly and appropriately to his pain complaints or that he was denied any other constitutionally-adequate medical care due to a custom or policy promulgated by Corizon. Accordingly, summary judgment will be granted in favor of Defendant Corizon.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Summary Judgment (Doc. 32) and Defendants' Motion for Summary Judgment (Doc. 36).

(2) Plaintiff's Motion for Summary Judgment (Doc. 32) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. 36) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 20th day of May, 2019.

David G. Campbell
Senior United States District Judge